Filed Sept 16, 1892.

---

No. 16,482.

## HALL *v.* THE STATE.

CRIMINAL LAW.—*Prosecution for Murder.—Administration of Poison.—Declarations of Decedent.—Res Gestæ.*—Where the defendant was indicted for murder, for administering poison in liquor to the deceased, it was proper on the trial of the charge to admit in evidence complaints of the deceased made shortly after taking the liquor that it was bitter. and accusing the defendant of having put quinine in it, the complaints having been made while the defendant was within hearing, and there being evidence that he heard the same, although he denied hearing them.

SAME.—*Declarations of Deceased After Occurrence.—Inadmissibility of.*—Declarations made by the deceased to his wife, in the absence of the appellant and some time after the occurrence, to the effect that the appellant had invited him to take a drink of blackberry wine, and that it was very bitter, etc., were not admissible in evidence. They were so separated from the act as to be merely narrative of what had occurred, and did not constitute a part of the *res gestæ.*

Hall v. The State.

SAME.—*Dying Declarations.*—Such declarations or facts stated by the deceased, which he would be permitted to testify to if a witness, are admissible as dying declarations, the conditions existing which permitted of the introduction of his dying declarations in evidence.

SAME.—*Reputation of Defendant for Peace and Quietude.— Use of Word " Inoffensive".*—Evidence of the general reputation of the accused for peace and quietude is admissible in a prosecution for murder, though the murder may have been committed by poisoning. The use of the word "inoffensive" as well as the words "peace" and "quietude" in interrogating the witness was not objectionable.

SAME.—*Evidence.*—It was not error to refuse to permit the defendant to prove that he had drank liquor with the deceased out of a bottle marked "poison," taken from the barn, and that the deceased said at the time that he marked the bottle and put whisky in it, and put it in the barn in order that his hired men would not know where it was, and in order that the women folks would not "catch on" to it, and to prove that he had other bottles at the same place, it not appearing when this occurred nor that at the time of the taking of the drink and death of the deceased he kept bottles in such manner at the barn, and from which he might have drank by mistake.

SAME.—*Suicidal Tendency of Deceased —Facts not Tending to Prove.*—It was not proper for the defendant to offer in evidence isolated facts as to the financial condition or domestic troubles of the deceased which would not show any suicidal tendencies on his part.

SAME.—*Counsel to Assist Prosecution.—Appointment of in Absence of Defendant.*—The court may appoint counsel to assist in the prosecution of a felony in the absence of the defendant, this being no part of the trial.

From the La Grange Circuit Court.

*A. Ellison* and *A. A. Chapin,* for appellant.

*A. G. Smith,* Attorney General, and *J. T. Sullivan,* for the State.

OLDS, J.—The appellant, Martin Hall, was indicted for the murder of one Sheridan E. Hughes, by administering poison to him.

There was a trial resulting in a verdict of guilty of murder in the first degree, and fixing the appellant's punishment at imprisonment in the State prison during life. Numerous errors are assigned. The contention on the part of the State was that the appellant invited the deceased to take a drink of liquor from a bottle which he had, and the deceased did.

drink from the bottle, and that there was strychnine in the liquor.

The deceased lived upon a large farm in La Grange county, his family consisting of his wife and child and mother-in-law, Mrs. Wallace, and himself. The farm, of four hundred acres, well improved, was owned by Mrs. Hughes and her mother, Mrs. Wallace. The deceased was about twenty-four years of age, in good health, and managed the farm, farming quite extensively and dealing in horses,--buying, selling and trading them. The defendant was a man about twenty-eight years old, and during the summer, prior to the death of Hughes, on the 16th day of September, 1891, he had been working for the Hughes, and had rented a field for wheat of him, and had been cutting corn for him, and he kept a horse and buggy there. On the morning of the 16th day of September, 1891, Mr. Hughes had two or three other young men working for him. There were also a Mr. Dill and his hired man, who were travelling across the county with a number of horses, and were camping near the house, at Mr. Hughes', on this morning. After breakfast Mr. Hughes had his team hitched to the buggy preparatory to going to town, and before going was transacting some business or completing a horse trade with Mr. Dill, and the other young men were getting ready to go to work. They were all about in the vicinity of the barn. The appellant was there also cleaning out his buggy and hitching up his horse preparatory to going away. After hitching his horse to his buggy, the appellant took a quart bottle, with what is said to be cherry wine and whisky, to the house. Mrs. Hughes tasted it and Mrs. Wallace drank of it and he left the bottle at the house. He then went back to the barn where his horse and buggy were and held up a small flask and invited Mr. Hughes to drink with him. Hughes came to the buggy, and in the presence of two of the hired men Hughes suggested to appellant that he drink first, and appellant took the bottle and placed it to his lips as if taking a drink. As

to whether he did in fact drink is controverted.  He then handed the bottle to Hughes, and he drank all there was in the flask except a teaspoonful or thereabouts and returned the bottle to the appellant, and he broke it on a stone at the edge of the barn.  Hughes then stepped away from the buggy by the side of the barn, and appellant got into his buggy and drove out into the road a short distance from the barn.  The evidence is conflicting as to the distance, witnesses placing it from fifteen rods to probably twice that distance.  When he got into the buggy he spoke to one of the other hired men and asked him if he was going to the corn-field to cut corn, and on his replying that he was, he invited him to ride, and he stopped in the road waiting for him, and remained there some minutes.

Soon after Hughes took the drink he began complaining of its being bitter, and commenced spitting and soon after complained of being sick.  Just the length of time after he took the drink that he began to complain is in dispute, but witnesses testify that it was while appellant remained waiting in the highway, and that he addressed appellant in a loud voice, accusing him of having quinine in the liquor.  The appellant disclaims having heard him say anything about it or make any complaint.  The appellant soon drove on and went to his father's, near to Kendallville, some twelve miles or more distant, where he was followed in the afternoon and advised of the death of Hughes.  There is evidence tending to show that appellant heard what Hughes said while appellant was waiting in the road.  Other witnesses an equal distance away testify to hearing what Hughes said.  Hughes died from one to two hours after taking the drink.  The declarations of Hughes from the time he drank from the bottle up to his death were admitted in evidence over the objection of the appellant.  There were three classes of declarations of Hughes admitted in evidence.

*First.*  Those made while the evidence tended to show that the appellant was within hearing distance.

*Second.* Those made after the appellant had departed and not made in view of approaching death, so as to be admissible as dying declarations.

*Third.* Dying declaration made after the deceased believed he would die in a very short space of time.

As to the first class of declarations, they were clearly competent. There was evidence tending to show that the appellant was within hearing distance and heard what Hughes said, and it was for the jury to determine whether or not he did in fact hear them.

The second class of declarations were of this character: Mrs. Hughes was testifying as a witness, and in answer to questions she testified that her husband, the deceased, on coming to the house, said that the appellant called him around the corner of the barn and asked him if he did not want a drink of blackberry wine. He said there was quinine in it, that it was very bitter, that it was an overdose of quinine; it was grainy; said he felt the grains as they went down his throat.

Under the well-established rule in this State these declarations were inadmissible. They were surely narrative of a past transaction made to the wife when Hughes came to the house in the absence of the appellant and some time after the occurrence. The exact length of time is disputed, possibly only ten or fifteen minutes after taking the drink. The exact time we do not deem material, but the declarations were separated from the act so that they became a mere narrative. If admissible at the time they were made, they would have been admissible at a much longer time afterwards if the deceased had lived.

In *Binns* v. *State*, 57 Ind. 46, it is held that declarations which are simply the narrative of a past event, depending solely for its effect upon the credit of the party making it, and not so connected with the main facts as to illustrate its character, are not competent evidence. The declarations

in that case, held to be inadmissible, are not materially different from those admitted in this case, and made quite as soon after happening of the event. In that case the deceased was shot, and she said " she was stooping down putting wood in the stove at the time of the occurrence, and the shot came from outside through the window, and she was stooping down fronting the window immediately fronting the stove at the time of the occurrence." This decision has been followed and approved by the subsequent decisions of this court. *Montgomery* v. *State*, 80 Ind. 338.

In *Jones* v. *State*, 71 Ind. 66, a witness testified that after the deceased was shot he first directed that a doctor be sent for, and that in five or six minutes after that he said Prince Jones shot him. This declaration was held to be inadmissible as a part of the *res gestæ*. The court in that case says: " It may not be necessary that the declaration should be strictly contemporaneous with the main fact in order to be admissible, * * * but all the authorities agree, so far as we are advised, that a declaration which amounts to no more than a mere narrative of a past occurrence is not admissible."

In the case of *Doles* v. *State*, 97 Ind. 555, the same rule is announced, and statements of the deceased to the effect that he had been waylaid by a person, naming him, and that he had hurt him, were held incompetent.

In *Stephenson* v. *State*, 110 Ind. 358, the decisions are collected and cited, and the same rule is adhered to.

The same rule that admits the statements of the deceased as a part of the *res gestæ* admits the statements of the defendant, for they are admissible on the theory that they are a part of the transaction,—the verbal act of a party explanatory of a concurring physical act, or, as is sometimes said, it is the transaction speaking through the party, but this can only occur when the declaration is made at the time in connection with the act. A declaration made after the act

is completed, relating what took place, is a mere narrative of what occurred, and is not a part of the *res gestæ.*

Some decisions of other courts may be found holding such declarations admissible, but under the decisions in this State, which are in accordance with the weight of authority, it was clearly error to admit the second class of declarations of the deceased.

As to the third class of declarations admitted as dying declarations, all we deem it necessary to say is that the rule is well settled that such declarations or facts stated by the deceased which he would be permitted to testify to if a witness, are admissible. *Montgomery* v. *State, supra; Boyle* v. *State,* 105 Ind. 469. These rules are so well settled that it seems unnecessary to discuss these questions at greater length.

The appellant offered to prove his general reputation for peace and quietude, and the court excluded it. In this the court committed an error. Evidence of the general reputation of the accused for peace and quietude is permissible in a prosecution for murder, though the murder may have been committed by poisoning. In a criminal charge the accused has the right to prove a character which would make it unlikely that he would be guilty of the particular crime with which he is charged. Wharton Crim. Ev. (9th ed.), section 60.

It is said in *Warner* v. *State,* 114 Ind. 137, that "An assault is a constituent element of the crime of murder." This is true though it be accomplished by the administering of poison, for the administering of poison is an assault. Cooley Torts (2d ed.), p. 88, section 164; *Commonwealth* v. *Stratton,* 114 Mass. 303; 1 Am. and Eng. Encyc. of Law, p. 804.

The party puts in motion an instrument of death. It matters not whether that instrument be a bludgeon wielded by the party himself, or the igniting of an explosive substance, the firing of a gun putting the ball in motion which penetrates the body, or the administering of poisonous drugs, which produce death. In either case the party puts in mo-

tion a force or power that produces death, and in either case it is the act of the party producing death, for which he is responsible, and for the doing of which and destroying life he is punished. A trait of character which would be inconsistent with the destruction of life by one method would be inconsistent with a disposition to take life by another. The object sought is to take life, whether it be accomplished by one method or another, and it has been held that proof of the general character of the accused for peace and quietude is admissible when he is on trial charged with murder, on the theory that one possessing such a character would be less likely to commit murder than one who did not possess those traits of character.

In this case in some of the interrogatories propounded the word " inoffensive," as well as the words " peace " and " quietude," were used. This is but another word to express the same trait of character, for to say that one was an inoffensive person would, we think, convey the impression that he was a peaceable and quiet person.

The appellant offered to prove by one O'Brien that he had drunk liquor out of a bottle with the deceased taken from the bottle marked " Poison," and that the deceased said at the time that he marked the bottle and put whisky in it and put it in the barn in order that his hired man would not know where his whisky was or be able to drink it, and in order that the women folks would not " catch on " to it, and to prove that he had other bottles at the same place. This evidence was offered on the theory that the deceased might himself have gone into the barn and made a mistake and taken a drink out of the wrong bottle and by mistake or accident taken poison. There was some other testimony in the case to the effect that deceased kept a number of bottles at the barn, some of them marked " Poison." As this offer appears in the record, there was no error in excluding this evidence. It does not appear where this occurred, nor does the appellant seek in connection with this evidence to follow it up

by showing that at the time of the taking of the drink and death of the deceased he kept bottles in such manner at the barn. It was undoubtedly proper to show, if such was the fact, that Hughes had been in the habit of keeping bottles of medicine with poison in them and marked "Poison" at the barn, and in connection with such bottles kept bottles of whisky marked "Poison," showing an opportunity for him to have taken poison by mistake, and to show, if such was the fact that the decased had in his possession such poisons as produced his death.

The appellant offered to make some proof as to the financial condition of the deceased, and as to his domestic relations, tending to show infidelity and neglect on his part. We deem it unnecessary to set out and consider the several items of evidence of this character offered and excluded. There does not seem to be any such surroundings in the case, or anything in the life or character of the deceased, or in the facts or circumstances surrounding his death, as to make this evidence admissible. It does not seem to us that if all of the evidence of this character that was contended for was admitted it would shed any light upon the question as to what caused the death of Hughes, or if produced by poison as to how, when, or in what manner he received it. There is, we think, nothing in the evidence offered and excluded relating to his financial and domestic relations, if all was admitted, to show any suicidal tendencies on the part of the deceased.

Proof of traits of character in the deceased, if any existed, showing a suicidal tendency might be made, but such was not the character of the evidence offered. Isolated facts as to financial condition or domestic trouble are collateral, and not competent to be given in evidence. The evidence as to the deceased's finances and domestic relations was properly excluded.

A question is presented as to the correctness of the instructions given by the court, also in regard to the action

of the court in refusing instructions requested by the appellant. There may be some doubt as to the correctness of the action of the court in the giving and refusal of instructions, but we deem it of no benefit to critically examine and pass upon the correctness of the court's rulings in this respect, as upon a retrial new instructions must be given, and there is no new principle involved requiring a decision. A question is presented in regard to the assignment of counsel by the court to assist in the prosecution, this being done in open court, in the absence of the appellant. As soon as the appellant was advised of the fact the appellant moved the court to strike out and revoke the appointment. There was no error in this. The court had the power to appoint counsel, and it was not a part of the trial. There was no abuse of discretion shown. The court might make the appointment of counsel to assist in the prosecution in the absence of the defendant. *Epps* v. *State*, 102 Ind. 539 ; *Tull* v. *State, ex rel.*, 99 Ind. 238.

Some other questions are presented which it is unnecessary to decide, as they may not arise on the retrial of the case.

For the errors hereinbefore stated, the judgment must be reversed.

Judgment reversed, with instructions to grant a new trial, and the clerk is directed to issue the proper order for the return of the appellant.

Filed June 9, 1892; petition for a rehearing overruled Oct. 5, 1892.