JOHN NORDGREN

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Opinion filed October 24, 1904.*

1. DYING DECLARATIONS—*dying declarations may be impeached.* Dying declarations may be impeached in any of the modes by which the evidence of the declarant could have been impeached had he or she been alive and testifying in open court.

2. SAME—*dying declaration is but secondary evidence.* A dying declaration is but secondary evidence, and it is error to instruct the jury that such declaration is the testimony of one witness and is entitled to such weight as it would be entitled to if it had been stated to the jury by one witness.

3. SAME—*hostility of declarant toward accused may be shown.* When a dying declaration, to the effect that the accused had given the declarant whisky and strychnine, is given in evidence, the accused may show that the declarant entertained a spirit of malice and revenge toward him because he had abandoned her on account of her habits and had filed a bill for divorce against her for habitual drunkenness.

4. EVIDENCE—*what evidence improper in murder trial.* The remark, "Because I think he poisoned my sister," made by a witness in answer to a question whether there was any other reason why she disliked the accused, who was on trial for the alleged poisoning of his wife, is improper and should be excluded.

5. SAME—*what competent as part of the res gestæ.* Where the charge against accused is that he gave his wife a bottle of whisky and strychnine, it may be shown that she kept whisky and strychnine in her room after her separation from her husband; and as explanatory of such act and as a part of the *res gestæ* it may be shown that she was despondent and made declarations tending to show an intent to commit suicide.

6. INSTRUCTIONS—*instruction having no basis in the evidence should be refused.* Upon the trial of one indicted for murdering his wife by poison, an instruction treating him as an accessory to the crime of suicide by the wife should be refused, where the theory upon which the instruction is based has no support whatever in the evidence.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. A. H. CHETLAIN, Judge, presiding.

This is an indictment of the plaintiff in error by a grand jury of Cook county for the murder of his wife, Ellen T. Nordgren. Plaintiff in error was tried in the criminal court of Cook county in February, 1903, and found guilty by the jury of the offense charged against him. The jury, before whom he was tried, fixed his punishment in their verdict at imprisonment in the penitentiary for the term of thirty years. Motions for new trial and in arrest of judgment were overruled, and on October 17, 1903, judgment was rendered on the verdict, and the plaintiff in error was sentenced to thirty years' confinement in the penitentiary. The present writ of error is sued out for the purpose of reviewing such judgment of conviction.

Some of the salient and material facts disclosed by the evidence are as follows:

Plaintiff in error, John Nordgren, was married to the deceased, whose maiden name was Ellen Theresa Alm, on August 1, 1896; and one child was born to them, a boy about six years old at the time of the separation between plaintiff in error and his wife, hereinafter stated. The plaintiff in error and his wife were Swedes. At the time of the separation he lived in an apartment at 912 Sheffield avenue or 613 Otto street in the north or north-west division of the city. His business was that of running an elevator in a building on Market street in the business center of the city, and required him to be absent from his home from seven o'clock in the morning to about six o'clock in the evening. After their marriage they lived together about six years. They separated from each other on August 11, 1902.

The evidence in the record is quite clear and conclusive that, for several years before their separation, the deceased, Mrs. Nordgren, was given to the use of intoxicating liquor, and was in the habit of getting drunk. There is also testimony to the effect that she was guilty, during the absence of her husband, of illicit intercourse with other men. The plaintiff in error was a witness upon the trial in his own behalf, and the State called out from him upon his cross-examination

the statement that his wife had confessed to two acts of adultery to him.  His statement in this regard is confirmed by other testimony in the record.  The evidence also shows that the plaintiff in error was kind and indulgent to his wife, and tried to induce her to quit her bad habits, but without avail. On August 11, 1902, he came to his home in the evening after the close of his day's work, and found his wife intoxicated, and at the supper table she seized a fork, or, as some of the evidence tends to show, a butcher's knife, and tried to stab him with it.  After he had put his boy to bed on that evening, she came to the bedside, and thereupon he took the boy, and left the house, and went to the house of a neighbor where he remained for several days with his boy.  In the meanwhile he procured some one to take his place in the running of the elevator and looked for a new room or living quarters, and finally located at 2810 Seeley avenue.  She then left the home where they had been living, and went to live at 328 Wells street, where she obtained a room in an apartment or house kept by a Mrs. Sarah Arnold.  She lived in the room, so rented of Mrs. Arnold, for seven weeks before her death, and, during the last three weeks of that time, her room-mate was a woman, named Sina Otness.

On September 19, 1902, the plaintiff in error filed a bill for divorce in the superior court of Cook county against his wife, and issued a summons against her returnable to the first day of the next term of said court to be held on the first Monday of October, 1902. Mrs. Nordgren, the deceased, died on Thursday evening the second day of October, 1902, and the following Monday, October 6, 1902, was the first day of the October term of said court.

W. S. ELLIOTT, for plaintiff in error.

H. J. HAMLIN, Attorney General, and CHARLES S. DENEEN, State's Attorney, (F. L. BARNETT, and F. L. FAKE, of counsel,) for the People.

Mr. JUSTICE MAGRUDER delivered the opinion of the court:

The charge against the plaintiff in error is, that he caused the death of his wife by giving her whisky which contained strychnine, or some other kind of poison. The only evidence against the defendant is an alleged dying declaration made by his wife. The circumstances connected with the making of this dying declaration, so far as they are disclosed by the record, are substantially as follows:

On October 2, 1902, the deceased was with her room-mate, Miss Otness, at different places from eleven o'clock in the morning to four o'clock in the afternoon. The record does not disclose the whereabouts of the deceased from four o'clock in the afternoon until half-past six in the evening. At half-past six in the evening, Miss Otness saw her in their room at 328 Wells street. Mrs. Nordgren and Miss Otness left the room at seven o'clock. At about ten minutes after seven o'clock they met the defendant at the corner of Wendell and Wells streets, on Wells street, one-half of a block north of where they lived. The plaintiff in error asked his wife if he might speak to her, and thereupon Miss Otness left them together. About nine o'clock, or five or ten minutes after nine o'clock, Mrs. Nordgren returned to 328 Wells street. What took place between her and her husband between ten minutes after seven and nine o'clock when she returned to 328 Wells street is not disclosed by any testimony in the record, except that of the plaintiff in error himself. He says that he was with his wife that night about forty-five minutes; that he walked with her up to the corner of Wells and Division streets, and then back again towards Wendell street, or Oak street. He says that she left him about eight o'clock; that he was detained because he missed his car, and then boarded a car bound northward, and went to his home at 2810 Seeley avenue. He says that the reason he spoke to his wife that night was that his boy had told him that she wanted something. He was not permitted by the court to state his conversation with her that night or what

was the subject of such conversation. In his affidavit filed on the motion for new trial he says that what she wanted to obtain from him was a sewing machine, belonging to her, which she had left behind when they separated.

When Mrs. Nordgren returned to 328 Wells street at nine o'clock, she went in and spoke to Mrs. Arnold, her landlady, who was in the kitchen baking cakes. Mrs. Arnold states that she seemed well and in better spirits than usual. After she left Mrs. Arnold, she went to her own room, the door to which was only from eight to ten feet from the door of the kitchen where Mrs. Arnold was. Mrs. Arnold states that, in about three or five minutes after Mrs. Nordgren went to her room, Mrs. Arnold heard a noise, and said that Mrs. Nordgren hollered in some way or made some kind of a noise. Mrs. Arnold went to the room of the deceased, and met her at the door, and says that the deceased said, "I have taken some whisky that my husband gave me to make me sleep." The deceased then commenced to fall over, and sat down on the edge of the bed, saying, "I am going to die; my heart has stopped beating." Mrs. Arnold then said: "I guess then she said she was going to die, she believed, and then she wanted a doctor, and mentioned Division street, and I said right away, 'I will send for one I know,' and I sent over on Oak street for a doctor I knew, and he couldn't come, and, while the little girl was gone for the doctor, she had a spasm." Mrs. Arnold says that she straightened up and said: "I am going to die and I am not ready to die;" and that she commenced to pray and said: "Pray for me." And she prayed in English and what Mrs. Arnold took to be Swedish. The latter asked her what she had taken, and she said: "The bottle is right down there," and she pointed to the wall in front of the dresser. Mrs. Arnold, being unable to find any bottle, the deceased got off the bed, and reached under the dresser, and got the bottle, and handed it to Mrs. Arnold. The bottle was produced upon the trial, and was identified as the bottle which Mrs. Arnold saw. The deceased then pointed to the bottle, and said that that was what she

took, and said a half-dozen times "that it was one her husband gave her." Mrs. Arnold says: "Sometimes she said that it was something she took that her husband gave her to make her sleep, and then she would say it was whisky that her husband gave her to make her sleep." Miss Otness returned to her room that night at 10:30, and, when she did so, there were present two doctors, a surgeon, and some detectives. She saw Mrs. Nordgren lying on the bed, and said that she had convulsions, but spoke to her; and, when she asked her where she had been, the deceased said she had been out with John, and that they had gone to Lincoln Park. Miss Otness says that this is all that the deceased said to her. Miss Otness did not hear the statement, stated by Mrs. Arnold to have been made by the deceased, to the effect that she had taken whisky, which her husband had given her to make her sleep, although, according to the testimony of Mrs. Arnold, this statement was made by the deceased after half-past ten when Miss Otness came in. A storekeeper, named Kiefer, and two physicians, named Anderson and Reichman, testified that the deceased stated that she obtained what she drank from her husband. One of the doctors testifies that in his opinion a dose of strychnine was the cause of her death.

Except the statement of the deceased, that she drank whisky, which her husband gave her to make her sleep, there is no evidence whatever that the plaintiff in error gave her any whisky, or any strychnine, or had anything to do with causing her death. There is nothing to show when, where, or how, or in what way the whisky was given to the deceased. The record is silent as to the manner in which the whisky, containing the strychnine, was given to the deceased. It is silent as to the place where the parties were when the whisky was so given, if it was given at all. The proof does not show, that the plaintiff in error had any whisky at the time when he met his wife upon the street on the evening of October 2, or that he went with her to any place where whisky was to be obtained.

*First*—The evidence leaves the mind in doubt upon the question, whether the deceased committed suicide by drinking whisky with strychnine, or some other kind of poison in it, or whether she received whisky from her husband, which contained such poison, as stated by her in the declaration so made by her.

Dying declarations may be impeached in any of the modes, by which the evidence of the deceased could have been impeached, had he or she been alive and testifying upon the witness stand. (*Dunn* v. *People,* 172 Ill. 582; 10 Am. & Eng. Ency. of Law,—2d ed.—p. 384). The evidence shows that the plaintiff in error was a sober, industrious man, and that he was attentive to the business, in which he was engaged. He took the stand as a witness in his own behalf, and denied that he gave his wife any whisky upon October 2, 1902. In his testimony he states as follows: "Q. When you saw your wife on the second of October did you give her anything?—A. No, sir; I did not.—Q. Did you ever give her any whisky at that time?—A. No, sir, I did not."

Seventeen witnesses testified that his general reputation for peace and quietude, and as a law-abiding citizen, was good. One of these witnesses was Mrs. Olivia Alm, a sister-in-law of the deceased, who says that they lived happily during the earlier years of their married life, and that after that, when they quarreled, it was always about the same thing, and she explains her meaning by the following statement: "He complained that she drank and kept company with other men." The room-mate of the deceased testifies that the latter kept liquor in her room. Exhibits were produced upon the trial which were found in her room. One of these was a whisky flask; the other a beer bottle; the other a small phial, containing a white fluid or powder. The whisky flask or bottle, containing the poison that caused her death, was seen in her room three days before her death. The plaintiff in error testifies that he never was in his wife's room at 328 Wells street; and no witness is produced, who ever saw him

in her room, or ever saw him have any whisky. The proof shows that she not only kept whisky and beer in her room, but that she kept strychnine or poison in her room.

It has been held that, "on a trial for murder, the dying declarations of the deceased are admissible as to the cause and extent of the injury received, and are open to remark before the jury in connection with general evidence of his intemperate habits and low state of health." (*State* v. *Thawley,* 4 Harr. 562; 6 Am. & Eng. Ency. of Law,—1st ed.—p. 133). It has also been held that "dying declarations may be discredited by showing that the character of the declarant was bad." (10 Am. & Eng. Ency. of Law,—2d ed.—p. 384, and cases cited in note).

It is impossible for any fair-minded man to read this record carefully without entertaining a reasonable doubt as to the guilt of this plaintiff in error.

*Second*—We think that the trial court committed error in some of its rulings upon the admission and exclusion of evidence, and that such error was prejudicial to the rights of the plaintiff in error.

One Julia Nelson testified as a witness in behalf of the State. Julia Nelson was a sister of the deceased. It is she, to whom the plaintiff in error alludes in the following statement made by him in his testimony, to-wit: "The first year we led a very happy life, but in the second—well, we did live very happy until her sister came over from the old country. After that it started to get a little trouble now and then, and we always got along fairly well until after about three years of married life; my wife—we did have a little trouble, but it didn't amount to anything until the last couple of years. It was because she used to drink quite heavy. I asked her why she done it, or if she wouldn't quit. I says, 'We have got a good home and everything and have got a child.' And she says, 'Well, I am not drinking much.' 'Well,' I says, 'you hadn't ought to drink anything. What is the reason you drink? Why do you drink?" This sister, whose maiden name was Julia Alm, married a Dr. Nelson on January 26,

1902. She lived a couple of years with the plaintiff in error, and his wife. Her cross-examination shows that she posed as an artist's model, and that Dr. Nelson, whom she married, paid her rent and board for a year and a half prior to her marriage. The following occurs in her testimony: "Now is there any other reason why you don't like this defendant here?—A. Because I think he poisoned my sister.—Q. Wait a minute. I didn't ask you. Tell me yes or no.—A. Yes." The district attorney said: "I think the witness answered the question. She says because she thinks he poisoned her sister." Attorney for the plaintiff in error then said: "I take exception to the remark." But no ruling was made by the court. It certainly was not competent evidence to allow Mrs. Nelson to state, as her opinion, that the plaintiff in error poisoned her sister. Her statement, that she thought the plaintiff in error poisoned her sister, was emphasized by the remark of the district attorney, who stated that she had answered the question, because she thought he had poisoned her sister. It will be a sorry day for the liberty of the citizen when a witness, who is not in any sense an expert, can say of a man, charged with producing murder by poison: "I think" he poisoned the deceased.

The defense offered testimony to prove that the deceased had, at various times and on various occasions, threatened to commit suicide, or to take her own life. And while some of the testimony, thus sought to have been introduced, may not have amounted to a threat to commit suicide, yet it indicated a disconsolate state of mind, and consisted of expressions to the effect that the deceased did not care to live any longer. The proof shows that her separation from her husband, and the taking of her child away from her, and the filing of the bill for divorce against her, and her own confessed inability to control her appetite for intoxicating liquors, worked upon her spirits and depressed her mind to a remarkable degree. Miss Otness testifies that the deceased had liquor in her room, and was in the habit of drinking, and that, during the three weeks when she roomed with her, she would be "blue," and

cry at times, and would say that life was not worth living, and would say that she was lonely, and once she uttered these words: "Pshaw! what is the use of living," and that she often uttered such words.

In *Siebert* v. *People,* 143 Ill. 571, we held that, on the trial of a wife and her paramour for the murder of her husband by administering to him poison, declarations of the deceased, made at different times within a year before his death, and prior to his last sickness, that he intended to take his own life, not accompanied by an act of the deceased which they might explain, being mere hearsay, were not admissible on the part of the defense. In that case we said (p. 588) : "The offered evidence was mere hearsay; it was not a part of the *res gestæ;* it was not a dying declaration; it accompanied no act of the deceased; it characterized no transaction, and we are aware of no well established principle upon which it was admissible.  *  *  *  . If a declaration of that character was accompanied with any act, tending to show an intent to commit suicide, it might be admissible in connection with the act. But no act was attempted to be proven. Indeed, the arsenic found in the stomach of the deceased was proven to have been administered to him within from two to four hours of his death, at a time it was utterly impossible for the deceased to procure or take the poison himself." This is undoubtedly the correct rule, with which we find no fault, where the declarations offered as evidence are not a part of the *res gestæ,* or accompanied by any act of the deceased which they might characterize or explain, but are mere naked declarations offered as original evidence. In the case at bar, however, the plaintiff in error offered to prove declarations made by the deceased, which accompanied and were explanatory of the acts of the deceased. The charge against the plaintiff in error is that he gave his wife a bottle or flask of whisky which contained strychnine, and that, by drinking the whisky so given to her, she lost her life. The proof proposed to be introduced was for the purpose of showing that, during the time which

elapsed between the filing of the bill for divorce against the deceased on September 19, 1902, and her death, and also during the time which elapsed between August 11, 1902, when her husband left her and took the child, and the 19th of September, 1902, when the bill for divorce was filed, she kept in her room bottles and flasks of whisky, and strychnine poison; and that, as explanatory of these acts, she made declarations tending to show an intent to commit suicide. It was not proposed to prove such declarations as original evidence, but as explanatory of the acts in question, and it was therefore error for the court to exclude or refuse to receive the offered evidence. The acts and declarations, sought to be proven, were part of the *res gestæ*. Bishop in his work on Criminal Procedure, (vol. 2, sec. 625, and note) says: "The declarations of the deceased or of any other third person who participated in the transaction which ended in death, * * * may be shown when either they, or some fact which they tend to explain, may be deemed a part of such transaction, whether the same were performed on one day or extended through many days; and provided that either the declaration, or the fact it would illustrate, is pertinent to the main inquiry."

The ground, upon which dying declarations are received, is "that they are made in a condition so solemn and awful as to exclude the supposition that the party making them could have been influenced by malice, revenge or any conceivable motive to misrepresent, and when every inducement, emotion and motive is to speak the truth. In other words, in view of impending death and under the sanctions of a moral sense of certain and just retribution. Dying declarations are, therefore, such as are made by the party, relating to the facts of the injury of which he afterwards dies, under the fixed belief and moral conviction that his death is impending and certain to follow almost immediately, without opportunity for repentance, and in the absence of all hope of avoidance; when he has despaired of life and looks to death as inevitable and at hand." (*Starkey* v. *People,* 17 Ill.

17). In *Starkey* v. *People, supra,* we said: "It is for the court in the first instance to determine upon the admissibility of-the declarations, upon proof of the condition of mind of the deceased at the time they were made." We further said in the same case: "The declarations, however, being admitted, the whole evidence, including that heard by the court as to the condition of mind of the deceased at the time they were made, should then go to the jury to enable them advisedly, and from all the lights the facts and circumstances afford, to determine upon the credibility, weight and force of the evidence. The condition and state of mind of the deceased, with all attending circumstances bearing upon the question, are proper for their consideration; and there is no ground upon principle or authority for excluding from their consideration the statements of the deceased as to his apprehension of death, nor of the surrounding circumstances forming the *res gestæ,* and tending to establish the existence or non-existence of that condition of mind, which would constitute his statements as to the cause of the injury in law dying declarations."

It must be remembered that dying declarations are in their nature merely secondary evidence, and the party, against whom they are produced in evidence, has no opportunity to cross-examine the party making such declarations. It has been held that, when dying declarations are offered in evidence, it is competent for the accused to show, on cross-examination of the State's witnesses, or by other witnesses, that deceased, in making the statements, was in a reckless, irreverent state of mind, and entertained feelings of malice and hostility towards the accused. (6 Am. & Eng. Ency. of Law,—1st ed.—p. 131; *Tracy* v. *People,* 97 Ill. 101). In *Tracy* v. *People, supra,* a brother of the deceased was introduced by the People for the purpose of identifying the written statement of the deceased, which was subsequently admitted in evidence as a dying declaration, and also to show the circumstances, under which it was made, and, on cross-examination, the witness was asked if, during a conversa-

tion of which he had spoken in his examination in chief as having occurred immediately before the written statement was made, or if, during any conversation had with the deceased after that conversation, the deceased used profane language, which the court refused to allow the witness to answer, and it was there held that, so far as this language related to the conversation of which the witness spoke in his examination in chief, there could be no doubt of its propriety, and that the question was also proper as tending to negative the assumption that the deceased, at the time of making the statement, was rational and had no hopes of life, and was not actuated by malice or revenge. Much of the testimony, proposed to be introduced by the plaintiff in error in the case at bar, and which the court refused to receive, had a tendency to show that the deceased entertained a spirit of malice and revenge towards her husband, because he had abandoned her on account of her habits, and refused to let her keep their child, and had also filed a bill for divorce against her, charging her with habitual drunkenness.

In support of the motion for new trial some twenty affidavits were read, made by neighbors of the deceased Mrs. Nordgren. These affidavits did not set forth newly discovered evidence, nor were they merely cumulative, or impeaching in character. They embodied the substance of what the plaintiff in error proposed to prove and offered to prove, but which he was not permitted by the trial court to prove. These affidavits showed that, for a long time before the separation between the deceased and her husband, she had led a life of drunkenness and debasing lewdness, and that in saloons, while on sprees, she would announce that she was tired of life, and had poison enough in her possession to kill a whole family. It is impossible that the twenty persons, who made these affidavits, should all of them have been guilty of perjury in the statements they make. There are so many of them, and their statements are so positive, that, as it seems to us, the trial court erred in refusing to grant the motion for a new trial.

Sina Otness testified that, three or four weeks before Mrs. Nordgren died, she said that she was in some restaurant and had something to eat that made her sick; and then witness asked her: "Weren't you out with somebody?" and she said, "Yes;" the witness then asked her who it was, and she said: "No one that you know;" and she also said at that time that she thought she was poisoned. Upon motion of the State's attorney this evidence was stricken out. We think that the trial court erred in so doing. It was held in *Dunn* v. *People, supra,* that dying declarations may be impeached by proof of contradictory statements on material points, though such contradictory statements were not made *in extremis;* and in that case, where there was a dying declaration against the defendant indicted for furnishing a drug to the deceased to produce an abortion, it was held that such dying declaration might be impeached by contradictory statements made by the deceased either before or after the abortion, even though such contradictory statements were not made *in extremis;* and it there appeared that, in the dying declaration of the deceased, she stated that she was in the family way by the defendant, and the statement, proved to have been made by her as contradictory to that, was a statement to the effect that she was in the family way by somebody else than the defendant. In other words, it was held to be competent to introduce a previous statement by her, that a certain other person produced the abortion, in order to contradict her dying declaration, that the accused was the person who produced such abortion. In the case at bar, the dying declaration of Mrs. Nordgren was to the effect that she had taken some whisky that her husband gave her to make her sleep, and the plain inference from this language was, that her husband had put poison in the whisky, which was the cause of her death. In the statement made to Sina Otness, the deceased said that she had gone to a restaurant, and eaten something which poisoned her, and that she went there with somebody, whom Miss Otness did not know. By making this statement the deceased could not have referred

to her husband, because the testimony shows that Miss Otness had known her husband for three years prior to October 2, 1902. The person, therefore, with whom she had gone to the restaurant, and by whom she claimed that she was poisoned at the restaurant, was some other person than her husband. This statement made to Miss Otness was contradictory of her dying declaration, and, therefore, should not have been excluded, because it tended to show that, if she was poisoned by anybody, there was some other person who may have administered the poison besides her husband. Under the doctrine announced in *Dunn* v. *People, supra,* the testimony should not have been excluded.

After the plaintiff in error had stated, that he had not given his wife any whisky or anything on the 2d of October, 1902, he was asked this question: "Q. Did you ever give your wife any whisky?—A. No, sir." The latter answer was stricken out by the court upon the motion of the State's attorney. We think that the court erred in so striking out this question and answer.

In addition to what has already been stated in regard to the incident in the restaurant, Mrs. Olivia Alm testified that, about three or four weeks previous to the death of the deceased, she stated that she had been out with her husband, and had taken the car going towards Evanston, and had dismounted from the car and sat down, and that her husband offered her some liquor, which made her sick, and that she threw it up, and that there was poison in it. When the plaintiff in error was asked if he *ever* gave his wife any whisky and answered, "No," he was contradicting the statement thus made by his wife in regard to the incident on the road to Evanston. If what she stated in regard to being poisoned at the restaurant was intended to refer to her husband, his answer, that he never gave her any liquor at any time, had a tendency to contradict that statement. Hence, the court should have permitted the answer to stand as it was given, denying the giving to her of liquor at any time, and not merely on October 2, 1902. It is impossible to believe that,

if the deceased suspected her husband of trying to poison her on the trip to Evanston only three or four weeks before October 2, 1902, she would have accepted from his hand on October 2, 1902, liquor that had poison in it.

Again, on the evening of October 2, 1902, when the deceased came into the kitchen where Mrs. Arnold was, Mrs. Arnold states that she appeared to be cheerful and in unusually good spirits, and she then said to Mrs. Arnold, in reference to somebody who had just gone out of the house: "That was my husband that has just gone out." That statement was unquestionably untrue. The testimony of Mrs. Arnold shows that, when the deceased came in at nine o'clock, or a little thereafter, on the night of October 2, 1902, she came alone, and was attended by nobody. Her husband did not come with her. It also appears from the evidence of one Anderson that he talked with the plaintiff in error at nine o'clock on that night at the Lincoln avenue car barns, which were a long distance north of 328 Wells street where the deceased was staying; and Anderson says that he rode with the plaintiff in error as far as Graceland avenue, which was still farther north of the car-barns. The testimony, also, of the plaintiff in error itself shows, that he could not have been at 328 Wells street at nine o'clock on that evening. The defendant swore that he never was in the room occupied by his wife at 328 Wells street, and that he was never at 328 Wells street at any time. The remark of the deceased: "That was my husband that has just gone out," was merely hearsay evidence, and no part of the dying declaration. The dying declaration: "I have taken some whisky that my husband gave me to make me sleep," was made after the statement that her husband had just gone out. The latter statement was objected to by counsel for the defendant, but was permitted to go to the jury. We think the court erred in this regard. It was not a part of the dying declaration, but was made before the dying declaration by a person shown by the testimony of the State to have been in unusually good spirits, and not in any antici-

pation of impending death. In view of the evidence, that the deceased received other men than her husband in her apartments, it would appear that the remark was made to lull the suspicions of Mrs. Arnold, and make her believe that the man, who went out, was her husband.

Dr. Nelson, the husband of Julia Nelson, was put upon the stand as a witness, and was asked a few questions, in answer to which he testified that he was married. to Julia Nelson on the 26th of January, 1902. Nothing else was proved by him than simply his marriage to Mrs. Nelson. This testimony was objected to by counsel for defendant, and a motion was made to exclude it. The motion should have been granted. We can see no object in introducing such evidence, unless it was to bolster up the character of Mrs. Nelson, who had said that she thought that the plaintiff in error poisoned her sister. The affidavits upon motion for a new trial show that Julia Nelson, the sister of the deceased, was as much addicted to the drinking of intoxicating liquor as the deceased was, and that she was the companion of the deceased in her debaucheries, and exercised a bad influence over her. It was utterly immaterial in determining the merits of this case whether Dr. Nelson was married to Julia Alm or not, and, therefore, the testimony should have been excluded.

In answer to questions put to the plaintiff in error upon his cross-examination by the People, the plaintiff in error had stated that his wife was not only addicted to the drinking of intoxicating liquors but that she had been untrue and unfaithful to him; and he stated that certain persons, naming them, including one Curtis, had told him about his wife's conduct and infidelity. Subsequently, the State put Curtis upon the stand, and the following appears as a part of his testimony: "Q. Mr. Curtis, I want to ask you to state to the jury as to whether or not you at any time, of your own knowledge, saw Mrs. Nordgren do anything that was wrong?—A. No, sir." Curtis had testified to the good reputation of the plaintiff in error for peace and quietude and

orderly conduct. The question, put to him by the State, and his answer thereto, had a tendency to discredit the plaintiff in error, who had spoken of Curtis as one of the men acquainted with his wife's conduct. In an attempted cross-examination of Curtis, counsel for the plaintiff in error asked him what he knew of the deceased, but the court refused to allow him to answer the question. We think that the court erred in this regard. The witness had stated, that he had not at any time of his own knowledge seen Mrs. Nordgren do anything that was wrong. But he may have had some knowledge of her wrongdoing, which he did not see with his own eyes. At any rate, the defense had a right to cross-examine him as to the character or extent of his knowledge of the deceased. This right of cross-examination was denied, and we think improperly.

*Third*—It is also assigned as error by plaintiff in error, that the trial court erred in many of the instructions, given by it to the jury, and in the refusal of instructions asked by the defense.

The thirty-fourth instruction given for the People told the jury as follows:

"The court instructs the jury, as a matter of law, that an accessory before the fact includes not only him, who stands by and aids, abets, assists or encourages the perpetration of the crime, but also him, who not being present, hath advised or encouraged the perpetration of the crime, and in this case the court instructs the jury that, even though you may believe from the evidence beyond a reasonable doubt, that the defendant, John Nordgren, was not present in person, still if you believe from the evidence beyond a reasonable doubt that the defendant, John Nordgren, had knowingly and willfully counseled and procured, advised or encouraged Ellen T. Nordgren to take and swallow a part or all of the contents of a certain bottle, and that at such time the said defendant knew such bottle to contain poison sufficient in quantity and strength to cause the death of a human being, and if the jury further believe from the evi-

dence beyond a reasonable doubt that the said Ellen T. Nordgren, in consideration of the counseling, procuring, advising or encouraging by the defendant, did take and swallow any or all of the contents of such bottle, and if the jury further believe from the evidence beyond a reasonable doubt that such act, so brought about by the said defendant, John Nordgren, caused the death of the said Ellen T. Nordgren in manner and form as charged in the indictment, then and in such case you should find the defendant, John Nordgren, guilty.''

Quite a number of instructions were given substantially the same as the thirty-fourth instruction above quoted. By this instruction the plaintiff in error is treated as an accessory in the perpetration of a crime. He was charged by the indictment with murdering his wife. The only crime, shown by the record in this case to which he could have been accessory, would be the crime of suicide. If he was accessory to the crime of suicide, then it must appear from the testimony that the deceased was herself consenting to the crime, and co-operating with the plaintiff in error in the commission of it. This theory finds no support whatever in the evidence in this case. There is no evidence, tending to show that the wife consented to commit suicide through the counsel and advice of her husband, nor is there anything in her dying declaration to the effect that she was committing suicide, or that the plaintiff in error had aided or abetted her in the matter of taking her life. In addition to this, the tendency of the evidence, introduced by the State, and the theory, upon which the case was tried, were that on the night of October 2, 1902, the whisky, containing the poison, was given by the plaintiff in error to his wife. Such evidently was the object of the statement, made just before the death of Mrs. Nordgren, that the plaintiff in error had just left the house in which she lived. The instruction states that, even though John Nordgren was not present in person, still, if the jury believed that he advised and encouraged his wife to take and swallow the poison, etc., they should find him

guilty. This language was calculated to make the impression upon the minds of the jury that, even though the plaintiff in error may not have given his wife the poisoned liquor on the evening of October 2, 1902, he may have left in her room the liquor and the poison, which were shown by the evidence to have been there before the night upon which she died. There is no evidence in the record, that the plaintiff in error was ever in her room before the night of October 2, 1902, and no evidence that he was there then, except her statement to Mrs. Arnold that he had just gone out. The tendency of the testimony was to show, that the liquor and poison, which were in the room of the deceased before the night of her death, were put there by herself, and the instruction in question assumes that they may have been put there before that night by the plaintiff in error, without any evidence in the record to sustain such a theory. We are, therefore, of the opinion that this instruction was erroneous.

Again, instruction, numbered 35, is based upon the belief of the jury that the defendant "knowingly and willfully placed poison in the way of Ellen T. Nordgren," etc. There is not a particle of evidence in the record that the plaintiff in error placed any poison in the way of his wife, nor does the dying declaration, which is the only evidence against the plaintiff in error, assert that he placed poison in her way. The dying declaration is to the following effect: "I have taken some whisky that my husband gave me to make me sleep." The statement is not, that he placed poison in her way, so that, without knowing that he so placed it, she might take it, and lose her life on account of it. The statement is, that he gave her the whisky, and the conclusion is, that he handed it to her with his own hands, and not that he left it in her room for the purpose of having it used by her without her knowledge of its character. The same defect exists in instruction, numbered 40, given in behalf of the People.

The twenty-ninth instruction, given for the People, told the jury that the dying declarations made by the deceased constituted "the testimony of only one witness," and that, in

determining what belief the jury should place in the truth of such declarations, they should give them such weight as they would be entitled to "if they had been stated to you by one witness." As has already been stated, dying declarations are in their nature secondary evidence, and are so regarded in law. It has, therefore, been held that "the jury should not be instructed that dying declarations are to be given the same weight and force as if the declarant had been a witness in court. To do so constitutes reversible error." (6 Am. & Eng. Ency. of Law,—1st ed.—p. 135, and cases in note; 10 Am. & Eng. Ency. of Law,—2d ed.— p. 386, and cases in note). The twenty-ninth instruction was couched in language which amounted to a violation of the rule thus announced by the authorities, and accordingly it was erroneous.

*Fourth*—The record does not show any motive for the act charged against the plaintiff in error. He had filed a bill against his wife for a divorce, and, in view of the testimony in this record, it cannot be doubted that in a short time he would have obtained a decree of divorce, together with the custody of his child. There was, therefore, no object in murdering his wife in order to get rid of her. It seems that he had a small amount of insurance, about $380.00, upon the life of his wife. After his separation from her he had an interview with the agent of the insurance company, and paid him a small premium of fifty cents, it appearing from the evidence that the premiums were paid in weekly or monthly installments. The evidence in regard to this matter shows that he was inclined to let the insurance lapse, because he had separated from his wife and filed a bill for divorce, or was about to file a bill for divorce against her. But the insurance agent told him that in view of the fact, that he had a child, he ought to allow the insurance to stand and keep the premiums paid. His own inclination, as shown by the testimony, appears to have been to let the insurance go because of the separation, and he only paid the premium through the persuasion of the agent, who came to see him

about it. The fact of the insurance, in connection with the circumstances detailed in the record in regard to it, does not establish any sufficient motive for causing the death of his wife in order to get the $380.00 of insurance money.

For the errors above indicated, the judgment of the criminal court of Cook county is reversed, and the cause is remanded to that court for further proceedings in accordance with the views herein expressed.

*Reversed and remanded.*