THARP v. STATE.

Opinion delivered May 1, 1911.

1.  HOMICIDE—INVOLUNTARY MANSLAUGHTER.—Involuntary manslaughter
    is an involuntary killing, done without any design, intention or pur-
    pose of killing, but in the commission of some unlawful act or in the
    improper performance of some lawful act.  (Page 192.)

2.  SAME—SUFFICIENCY OF INDICTMENT.—Under an indictment charging
    murder in the first degree with a deadly weapon, the name and de-
    scription of which is unknown to the grand jurors, the accused may
    be convicted of involuntary manslaughter.  (Page 192.)

3.  SAME—EVIDENCE—VARIANCE.—Under an indictment for murder, al-
    leged to have been committed with a deadly weapon, proof that de-

fendant caused the death of deceased by assaulting and pursuing him, and causing him in the night to fall into a ravine and break his neck, is not a variance, as the allegations as to the manner of causing death were not material, and could be treated as surplusage. (Page 193.)

Appeal from Sebastian Circuit Court, Fort Smith District; *Daniel Hon,* Judge; affirmed.

## STATEMENT BY THE COURT.

Appellant, was convicted of involuntary manslaughter upon an indictment charging Gus Ivey, Glenn Reyburn and himself with the murder of Jay Kagg, committed as follows: "The said defendants in the county and district aforesaid on the 15th day of June, 1910, unlawfully, willfully, and of his malice aforethought and with premeditation and deliberation, did assault, kill and murder one Jay Kagg in the peace of the State by striking him, the said Jay Kagg, with some deadly weapon, the particular name and description of which is to the grand jury unknown, and which said instrument was then and there a deadly weapon, and was then and there had and held in the hands of them and each of them, the said defendants, Joe Tharp, Glenn Reyburn and Gus Ivey, *alias* Curley."

The testimony tended to show that there were two different crowds of men in the red light district in Ft. Smith on the night of the killing of Jay Kagg: in one, Lon Shaw, Glenn Reyburn, Ben Reed, Grover Lee and appellant, Joe Tharp; in the other Pat Gossett, Burl Bourland, Grady Templeton and Jay Kagg; that they had been to two or three of the houses, and some little fighting had been indulged in; that finally the crowd in which Lon Shaw and Joe Tharp were met Bourland, Templeton, Gossett & Kagg near the corner of Laura Zeigler's resort, just across the street from which is Bessie Stevens's place, and the street which separates them is closed by a fence on the edge of a deep gulch or ravine which leads to the river, some three hundred feet or more further on, and into which a sewer empties, and this fence connects with the inclosure around each of the houses, thereby forming a complete barricade in the street.

When the appellant and his party met the deceased and his associates, the two crowds began to sing, and Templeton, who was with the deceased, made an ugly remark about the singing.

Ivey, one of the appellants, thinking the remark was addressed to him, resented it, but Templeton explained to him that he was talking to Gossett and Kagg, whereupon Gossett said: "If you are going to squabble, come out and fight it out fair." At this remark Templeton struck Ivey, and about that time the deceased struck a boy named Shaw, who was with the appellant, hitting him on the head. Tharp and Reyburn were around Kagg, and Tharp identified Kagg as the person who had hit Shaw, and they began striking at Kagg, who started backing towards the rear of the Stevens house, followed by Tharp, Ivey and Reyburn. It seems that Ivey was in the lead, and that Kagg backed until he reached the fence, at the edge of the gulch. As he did so, he said to Ivey (who was also called Curly): "Throw down that brick, and fight fair." When he got to the fence, Ivey was within three or four feet of him, and Kagg threw his hands on it and one leg over, and jumped or fell over the fence, and Irene Pryor exclaimed, "My God, that man has killed himself." There was a fall of about thirteen feet from the fence to the first flat place where the body might have struck, and about twenty-five feet to the second ledge. The body seemed to catch and pitch down head-foremost, and fell with a heavy thud. After the deceased fell, Ivey went down under the embankment, toward the place where Kagg fell, and began throwing something around in the bushes, and swearing. The appellant presently came around from above, and went down and walked up and down the river bank. They were down there together from 15 to 30 minutes, and afterwards came back and ran off the deceased's associates, Gossett and Bourland. Shaw testified that as they were going along he asked the appellant what became of Kagg, and he (appellant), told him that he ran him to the sand bank and into the river. The gulch and ravine and river bank were searched that night, and only the hat of the deceased was found, and the body could not possibly have fallen or rolled into the river. A few days thereafter it was found tied to a snag in the river about three hundred feet below opposite the place where Kagg was knocked or fell from the fence. An examination of the river bank disclosed footprints apparently made by two men walking together, and an impression in the soft mud which appeared to have been made by a body laid down there. The body was identified as that

of Kagg, and the neck was broken, and there were two bruises on the face and head, neither of which fractured the skull. There was little or no water in the lungs, and the doctors testified that death resulted from the broken neck, and that the man was dead before the body was thrown into the river. Appellant, when arrested, first denied his name was Tharp, asked if that body had been found, and said he could prove that he never killed him— this all before he was informed as to the charge upon which he was arrested.

The court, among others, gave, over appellant's objection, instruction No. 6 for the State as follows: "The jury cannot convict of murder unless the evidence shows a killing in the manner mentioned in the indictment, but may convict of a lower degree of homicide, if the evidence warrants a conviction for a lower degree, whether the killing was done in the manner mentioned in the indictment or not."

The jury found appellant guilty of involuntary manslaughter, and from the judgment he appealed.

*Ira D. Oglesby,* for appellant.

The court erred in charging the jury that the defendant could be convicted of a lower degree of homicide than murder, whether the killing *"was done in the manner charged in the indictment or not."* The State having alleged that defendant killed deceased by striking him with some deadly instrument held in his hand, the name and description of which was unknown, it was incumbent on the State to *prove* such killing. The manner of the killing must be substantially set out, and the evidence must fall within the allegations of the indictment. 26 Ark. 223; 27 Ark. 493; 110 Pac. 458; 92 N. W. 491.

*Hal L. Norwood,* Attorney General, and *Wm. H. Rector* Assistant for appellee.

There is no variance between the *allegata* and *probata,* nor is there any error in instruction 6. The State was not required to prove there was an actual striking, and the proof shows that Ivey had a brick in his hand. Wharton on Hom. (3 ed.) § § 211. 212-218, 563 *et seq.;* 118 Mass. 1; 162 *Id.* 90. It is not necessary to fully describe a crime, nor give the full particulars of the charge, and if same are inserted they need not be proved,

162 Mass. 90; 1 Russell on Crimes (3 ed.), 558; Stark. Cr. Pl. (2 ed.) 92; Archb. Cr. Pl. (10 ed.) 407; Kerr on Hom. § 257; Wharton on Hom. § 556 *et seq.* It is unnecessary to prove the exact manner in which the instrument is used, and if so alleged the State is not required to prove same. 5 Mont. 242; 67 Mo. 13; 104 Ind. 347; 99 S. W. 1114; 21 Cyc. 845-6.

KIRBY, J., (after stating the facts.) It is contended that the court erred in giving instruction No. 6 telling the jury that they might convict of any lower degree of homicide than murder, if the evidence warranted, whether the killing was done in the manner charged in the indictment or not. Section 1762, Kirby's Digest, provides: "The manner of the killing is not material, further than it may show the disposition of mind or the intent with which the act was committed."

While the jury could reasonably have inferred from the testimony that Ivey, one of the parties pursuing Kagg with appellant, struck him with the brick, causing him to fall from the fence, undoubtedly he was killed by the fall or jump over the fence into the ravine resulting in a broken neck, and not by striking him with some deadly instrument held in the hands of Joe Tharp, as charged. Appellant was convicted of involuntary manslaughter, a crime that may be committed without any intent to take life.

Involuntary manslaughter, as defined by Wharton in his work on Homicide (3 ed., § 211), is an involuntary killing "done without any design, intention or purpose of killing, but in the commission of some unlawful act or in the improper performance of some lawful act." See section 1779, Kirby's Digest.

Since the manner of the killing is not material further than to show the intent with which the act was committed, in murder even, and no intent to take life is involved in the commission of the offense of involuntary manslaughter, of which appellant was convicted, he was sufficiently advised of any offense of which he might be found guilty under the indictment for murder, and proof of causing the death of deceased by assaulting and pursuing him with others and causing him in fear, or in retreating from the danger, to jump or fall from the fence in the night into the ravine and break his neck was sufficient, notwithstanding he was charged with killing deceased by striking him with a deadly instrument to the grand jury unknown.

It was not necessary to allege the method or manner of killing or causing the death of deceased to charge appellant with involuntary manslaughter, and such allegations of the indictment, so far as that offense was concerned, were not material, and could be treated as surplusage without prejudice to any substantial right of appellant. The court committed no error in giving said instruction numbered six, and the instructions fairly submitted the case to the jury, and the evidence is sufficient to sustain the verdict.

The judgment is affirmed.