KAGEN AND TIBBETT *v.* STATE.

4974                                              334 S. W. 2d 865

Opinion delivered May 9, 1960.

190

*J. Sam Wood, Martin L. Green, Jack Rose,* for appellant.

*Bruce Bennett,* Attorney General by *Ben J. Harrison,* Asst. Attorney General, for appellee.

SAM ROBINSON, Associate Justice. Appellants appeal from convictions of involuntary manslaughter and sentences of three years each in the penitentiary. The only point we reach is whether the evidence sustains the verdicts.

On August 19, 1959, the appellants, Bruce Kagen and Jimmie Tibbett, and Clinton Silvey and Claudine Gilliam, met at the DeLuxe Cafe in Fort Smith. They all agreed to go swimming near Sugar Loaf Mountain. They left in Silvey's car and went to two or three places attempting to get other girls, but were unsuccessful in that respect. They then proceeded to buy some whiskey, gin and vodka. Silvey was driving the car and did not go to the swimming place near Sugar Loaf, but drove to a strip pit full of water, made in a mining operation. On the way Claudine Gilliam became very drunk and passed out, and either she or someone else took her clothes off, and apparently she had vomited on herself.

According to the evidence, Tibbett took her down to the water in the strip pit, washed her and bathed her face; brought her back to the car and put her clothes on. According to the statements of appellants, they endeavored to get Silvey to take all of them back to town because of the condition of the girl. Silvey became very angry and got out of the car with a pair of metal knucks on his hand and made an attack on the appellant Kagen. The two clinched, and Tibbett came up and caught hold of Silvey, who then asked them to turn him loose, that everything was all right; but when they turned Silvey loose, he ran away a short distance and began throwing rocks at Kagen and Tibbett, who were standing near Silvey's car. It is indicated that the rocks struck the car, because pictures introduced in evidence show damage to the vehicle.

The appellants did not testify at the trial, but made statements subsequent to the tragedy that they had thrown one rock each in the direction of Silvey at the time and that he could have been struck by one of the rocks. Appellants also stated that Silvey then ran to the strip pit and entered the water; that they threw nothing at him while he was in the water, only endeavoring to get him to come back and drive them to town, but that Silvey swam on out into the water and they heard nothing more of him. They concluded that he drowned or had come out on the other side of the pit. Appellants attempted to start Silvey's car, but could not do so. They then walked to Eugene Johnson's house about a half-mile away, taking Claudine Gilliam with them. Tibbett assisted her in walking. The Johnsons had no telephone, but the Johnson boy went with one of the appellants to a neighbor's house about two and one-half miles distant, and the sheriff was called.

The sheriff went to the scene immediately and after searching around the strip pit and seeing no evidence of anyone having come out of it, made arrangements to obtain grappling hooks for the purpose of dragging the strip pit, which was very deep. Two sets of grappling hooks were obtained, one of which was made of an iron

bar about four feet long, with sharp hooks about three inches long extending from it. After dragging the pit for a considerable time with both sets of grappling hooks, the body had not been located. Skin diving apparatus was then obtained, and by the use of this equipment Silvey's body was found at the bottom of the pit in water about 60 feet deep, at a point about the middle of the pit, which is approximately 125 feet wide, and about 60 feet from the end of the pit. In other words, the body was at least 60 feet from dry land in any direction. When the body was brought to the surface, it was found that there was a gash in the scalp to the rear of the top of the head, about three-quarters of an inch long. When found, the body was lying face down, with the hands under the body, and there were marks where grappling hooks had passed close to the body. In fact, mud had been stirred up by the hooks and settled on the body. No doubt the gash in Silvey's head could have been made by the grabs. An autopsy was made and the autopsy report contains this statement: "The autopsy findings indicated that the cause of death was due to asphyxia (drowning). A laceration was found at the top of the scalp. This was strictly in the skin and was superficial. No evidence of fractured skull or traumatic injury to the brain could be seen. The other findings are incidental." The autopsy report also shows that the body contained 191.4% of alcohol, and the undisputed evidence is that with this amount of alcohol in the body a person would be very drunk.

If appellants made a vicious attack on Silvey, causing him to jump into the strip pit in an effort to save his life or to prevent great bodily injury, they would be guilty of homicide. *Tharp* v. *State,* 99 Ark. 188, 137 S. W. 1097. But there is no substantial evidence that this occurred. The deceased could not have got to a point above where the body was found except by swimming. There is no current in the pit, and the record does not indicate that there was a boat. And of course if appellants had struck him in the head with a rock while he

was in the water and knocked him unconscious, causing him to drown, they would be guilty. There is no substantial evidence to sustain either theory. Even assuming that the appellants were throwing rocks at Silvey and he felt it necessary to make a hasty retreat, it was wholly unnecessary that he jump into the water in order to get away. Pictures of the scene of the killing were introduced in evidence, and there is a clear strip of ground about 50 feet wide around the strip pit. Silvey could have gone in any one of three directions without going into the pit. The fact that Silvey did jump into the pit, as stated by appellants, is corroborated by the fact that his shoes were found at the place 30 or 40 feet from the pit, where they said he ran. The shoes were about 25 feet apart, indicating that they had come off while he was running. They were not laced up. In 25 A. L. R. 2d 1187, it is stated that one may be found guilty of some degree of homicide by causing another to jump to his death, but it must appear that the act of the deceased was such a step as a reasonable man might take and that his apprehension was of immediate violence or injury and must have been well grounded. Cases from eight states are cited in support of this doctrine.

When Silvey's body was found, there was a pair of metal knucks on his left hand. The evidence is that there was no indication that Tibbett had been drinking, and Kagen showed no signs of intoxication, although he stated to the sheriff that he had taken some drinks. Claudine Gilliam was so drunk that according to her own testimony she passed out before arriving at the strip pit and still needed help in walking to Johnson's after the tragedy occurred, and the sheriff testified that she was groggy when he got to the Johnson house. The State lays much stress on the fact that at just about the place where appellants said Silvey was when the rock throwing occurred there are some blackberry vines, and although Silvey had on no shirt, there were no scratches on his body. A picture of the vines is in the record and they do not appear to be so high as to indicate that they would necessarily scratch the top part of a person's body.

Moreover, there is no evidence in the record that Silvey was actually in the blackberry vines. The State cites the cases of *Tharp* v. *State,* 99 Ark. 188, 137 S. W. 1097, and *Padgett* v. *State,* 151 Ark. 290, 236 S. W. 603, in support of the proposition that when one is killed in trying to avoid an unlawful assault, such a happening will sustain a homicide conviction, but in neither case are the facts similar to the case at bar.

There is no evidence whatever that any rocks were thrown at Silvey while he was in the water, and to say that the accused threw at him in such circumstances would be pure speculation. Professor Wharton, in his work on Criminal Evidence, Vol. 2, § 872, states: "To sustain a conviction, proof of the criminal agency is as indispensable as the proof of death. The fact of death is not sufficient; it must affirmatively appear that the death was not accidental, that it was not due to natural causes, and that it was not due to the act of the deceased. Where it is shown by the evidence, on one side, that death may have been accidental, or it may have been the result of natural causes or due to suicide, and on the other side, that it was through criminal agency, a conviction cannot be sustained. Proof of death cannot rest in the disjunctive. It must affirmatively appear that death resulted from criminal agency."

In *Taylor* v. *State,* 211 Ark. 1014, 204 S. W. 2d 379, in holding that the evidence was not sufficient to sustain conviction, the Court quoted from *Bowie* v. *State,* 185 Ark. 834, 49 S. W. 2d 1049, 83 A.L.R. 426, as follows: "In a case depending on circumstantial evidence the circumstances relied upon must be so connected and cogent as to show guilt to a moral certainty and must exclude every other reasonable hypothesis than that of the guilt of the accused. Circumstances, however strong they may be, ought never to coerce the mind of the jury to a conclusion of guilt if they can be reconciled with the theory that one other than the defendant has committed the crime or that no crime has been committed at all."

From a careful study of the record it does not appear that appellants were at any time mad at Silvey or

wanted to harm him. Appellants stated that Silvey made an attack on Kagen with a pair of metal knucks and appellants merely held him and let go of him when he asked to be turned loose. When Silvey's body was recovered the knucks were on his hand. It does not appear that appellants were intoxicated; in fact, it does not appear that Tibbett had been drinking at all, and certainly Kagen had drunk very little. The sheriff said he showed no sign of intoxication. Moreover, only three half pints of liquor were bought. Claudine Gilliam said she drank all the whiskey; and from the amount of alcohol in Silvey's body, he must have drunk practically all of the half pint of gin and the half pint of vodka. Even though appellants threw some rocks at Silvey while he was throwing rocks at them, certainly there is no evidence, circumstantial or direct, that they wanted to kill him, and surely no one in his right mind would throw rocks at anyone swimming in deep water unless a homicide was intended. Nothing in the record would indicate that appellants were not in their right minds. They went out with Silvey and the girl in Silvey's car to go swimming. Kagen drank very little and it appears that Tibbett drank nothing. Before they got to go swimming, the girl became intoxicated and sick and unconscious. Tibbett tried to help her by bathing and putting her clothes on her, all except her panties, and when Silvey's body was recovered, they were found in his pants pocket, as were the keys to the car, along with a contraceptive. It appears that if anyone had sexual relations with the girl, it was Silvey, and not either of appellants.

Eugene Johnson testified that while appellants and the girl were at his house the girl said: "They're lying to you. They know where the body is. It's over there all right but they know how it is there, and they're the ones that put it there." One of the appellants replied: "She's sick. She doesn't know what she is saying." The alleged statement of the girl was hearsay, and to be admissible it must come within one of the exceptions to the hearsay rule. There is at least grave doubt that it comes within such an exception. The girl who is alleged to have made the statement was in court and tes-

tified as a State's witness, but she did not testify that she made the statement attributed to her by Johnson. However, she did testify:

"Q. How many different stories have you told the officials here, including Mr. Glenn Abbott. —Of different things you thought you might have remembered?

A. I don't know. I must have told him something the night I came in but I don't know what I told him. — The night they picked us up.

Q. Was that because you were still intoxicated?

A. No, not exactly. I was a little drunk. —I was passed out when they came after us.

Q. You were passed out when they came to Johnson's to get you?

A. Yes, sir.

Q. And you were passed out when you got to the strip pit, weren't you, Claudine?

A. That's right, but I walked up to the farmhouse by myself.

Q. Did you just walk in a trance?

A. Well, Jimmie might have been holding me up a little."

In order to bring hearsay evidence of an implied admission within the exceptions to the hearsay rule, not only must it be shown that the statement was made, but it must also be shown that the accused heard the statement; that he understood it, and remained silent or evaded a response. It is the failure to deny that is significant. If the total response adds up to a clear-cut denial, this theory of implied admission is not properly available. McCormick on Evidence, pp. 528-530. Here one of the appellants — the record does not show which one — spoke up and said, "She's sick. She doesn't know what she is saying." In the circumstances it appears that the reply is all that was required and the girl's statement therefore does not have any proba-

tive value, although no objection was made to the admissibility of it.

The law presumes a defendant innocent until proved guilty beyond a reasonable doubt. Where the State depends on circumstantial evidence, this Court has said: "The evidence against the accused was entirely circumstantial. In such cases it is required that the evidence relied on must show the guilt of the accused to a moral certainty and must exclude every other reasonable hypothesis than that of the defendant's guilt. We conclude that the testimony adduced was not sufficient to establish the guilt of appellant with the certainty that the law requires in cases of this kind. We cannot say that the circumstances shown could not be reasonably explained except upon the hypothesis of appellant's guilt." *Johnson v. State*, 210 Ark. 881, 197 S. W. 2d 936.

It is our conclusion that the evidence in the case at bar is not sufficient to sustain the verdicts. The judgment is therefore reversed and the cause remanded for new trial.