Ethridge L. CARTER *v*. STATE of Arkansas

CR 95-1011                                          921 S.W.2d 924

Supreme Court of Arkansas
Opinion delivered May 13, 1996

*Dave Wisdom Harrod*, for appellant.

*Winston Bryant*, Att'y Gen., by: *J. Brent Standridge*, Asst. Att'y Gen., for appellee.

ROBERT L. BROWN, Justice. Appellant Ethridge Carter was convicted of murdering his wife, Shirley Carter. He appeals his conviction and life sentence on grounds of insufficiency of the evidence and various errors committed at trial. We conclude that the evidence submitted by the State was substantial and that no reversible error occurred at trial. Accordingly, the judgment is affirmed.

At about 10:15 a.m. on April 29, 1994, the Heber Springs Police Department received a 911 call that Shirley Carter had been shot at her home. She had been shot through the head with a .22 caliber semi-automatic pistol. She was still alive when the EMT's and police officers arrived, but she subsequently died in the hospital. Ethridge Carter was later charged with first-degree murder, found guilty by a jury, and sentenced to life imprisonment.

Carter's first point on appeal is that the trial court erred in denying his motion for a directed verdict and his post-trial motion for a judgment of acquittal notwithstanding the verdict. A motion for directed verdict is a challenge to the sufficiency of the evidence. *See, e.g., Misskelley* v. *State*, 323 Ark. 449, 915 S.W.2d 702 (1996); *Galvin* v. *State*, 323 Ark. 125, 912 S.W.2d 932 (1996); *Littlepage* v. *State*, 314 Ark. 361, 863 S.W.2d 276 (1993). In determining the sufficiency of the evidence, we review the evidence in the light most favorable to the State and sustain the conviction if there is substantial evidence to support it. *Misskelley* v. *State, supra*; *Galvin* v. *State, supra*; *Mills* v. *State*, 322 Ark. 647, 910 S.W.2d 682 (1995). Evidence is substantial if it is of sufficient force and character to compel reasonable minds to reach a conclusion and pass beyond suspicion and conjecture; only the evidence supporting the conviction need be considered. *Id.*

In order for circumstantial to be sufficient, it must exclude every other reasonable hypothesis consistent with innocence. *Walker* v. *State*, 324 Ark. 106, 918 S.W.2d 172 (1996); *Nance* v. *State*, 323 Ark. 583, 918 S.W.2d 114 (1996). That determination is a question of fact for the fact-finder to determine. *Pike* v. *State*, 323 Ark. 56, 912 S.W.2d 431 (1996); *Nooner* v. *State*, 322 Ark. 87, 907 S.W.2d 677 (1995); *Missildine* v. *State*, 314 Ark. 500, 863 S.W.2d 813 (1993). However, the fact-finder must not be left to speculation and conjecture in arriving at its conclusions on the matter. *Smith* v. *State*, 264 Ark. 874, 575 S.W.2d 677 (1974). Two equally reasonable conclusions as to what occurred merely give rise to a suspicion of guilt. *Id.*

The evidence supporting the State's case is summarized below. Lori Brown, a daughter of Shirley Carter, testified that her mother was age 57 at the time of her death. According to Brown, her mother was in "great spirits" just prior to her death. Brown testified that her mother had no knowledge about guns; indeed, she was "scared to death" of guns. Brown added that the deceased did not

know how to use a gun.

Keith Edmonds, an emergency medical technician, testified that he was called to Shirley Carter's residence on April 29, 1994. He knocked on the door, and Carter informed him that his wife had shot herself in the bedroom. Edmonds further testified: "And, you know, he [Carter] said be careful because, you know, the gun is still loaded." Edmonds further explained that Shirley Carter was found on her bed in a strange position because her arms were above her head. He testified that the gun was in her left hand, which was turned palm-out away from her face.

Alan Hubbard, another EMT, informed the jury that Carter told them to be careful because Shirley Carter had a gun. Hubbard testified that he observed a gunshot wound to the right temple area and that the deceased was still "clutching" the gun as if she were about to shoot it. According to Hubbard, the gunshot wound entered the right side of the head and exited the left. Hubbard recalled that the gun was in the deceased's right hand. In his report, he described her right arm and right hand with the gun as being draped over her head and resting on top of her left hand and arm. Hubbard carefully took the gun from Shirley Carter's hand, using both of his hands in the process, and handed it to a police officer who took it with a pen or pencil. Hubbard denied putting the gun on safety. Hubbard described Carter's demeanor that day as simple and very short, "almost of a sense of disgust . . . ." It was his impression that Carter seemed angry that Shirley Carter had shot herself.

Detective Mark Baugh of the Heber Springs Police Department testified that when he arrived, three EMT's were working on Shirley Carter. Officer Ron Wildman of the police department was also present at that time. Baugh testified that he picked up the firearm which was lying on the dresser and placed it in a paper sack. He observed that the safety was on. Once he took the gun back to his office, Baugh removed the magazine and ejected the shell from the chamber. Baugh testified that he also found a spent shell casing on a night stand next to the bed. The actual .22 caliber bullet was later extracted from the bed linens. Baugh added that he asked Carter what had happened, and Carter told him that he was in the living room and that Shirley Carter had lain down to take a nap. A short while later, Carter heard a pop, and he found his wife lying in the bed with a gunshot wound. At that point, he called for help. On

cross-examination, Baugh admitted that EMT Hubbard had reported that the pistol was in Shirley Carter's right hand. It was his understanding that, other than Hubbard, no one could agree on which hand the pistol was in.

Officer Ron Wildman testified that he was the first police officer on the scene on the morning of April 29, 1994, and he arrived just after the EMT's. Wildman testified that Shirley was lying on her bed and that a .22 caliber semi-automatic pistol was in her left hand.[1] Wildman stated that he collected the gun powder residue samples from Shirley Carter at the hospital and from Ethridge Carter at the police station. Wildman described Carter's demeanor as very calm, even when he was administering the gun powder residue test.

Dr. Frank Paretti, a forensic pathologist and medical examiner with the State Crime Lab, testified that the deceased's body showed no signs of trauma except for the gunshot wound. Paretti explained that the entrance wound from the bullet was a contact wound and entered on the right side of the head. The bullet exited the left side of the deceased's head. Paretti testified that when people sustain gunshot wounds to the head, they become limp. Berwin Monroe, a firearms examiner with the State Crime Lab, testified that the .22 caliber bullet that was recovered from the bed linens was fired from the gun that was taken from the scene. He testified that the gun would not fire when the safety was on. Gary Lawrence, who works in the trace evidence section of the State Crime Lab, testified that the gun powder residue tests from both Carters yielded negative results. Lawrence explained that the negative result could have been due to Ethridge Carter's washing his hands. Lawrence further testified that the gun was tested to see if it emitted a detectable level of gun powder residue. The results of that test were that "very good levels" of residue were emitted from the gun. Lawrence estimated that ten percent of the firearms and ammunition combinations are non-emitters of detectable residue.

After the defense put on its case, the State called Lila Thompson, another friend of Shirley Carter's, as a rebuttal witness. She testified that the deceased was happy on the day before her death

---

[1] In Officer Wildman's incident report, he described the pistol as being "in one of her hands."

and that she never said a word about killing herself.

■ From this proof, the jury was well within its bounds to conclude that Carter shot his wife, placed the safety in the "on" position, put the pistol in his wife's left hand, and washed his own hands, thereby removing the gun powder residue. To the extent there was conflicting testimony about which hand the gun was in, this was for the jury to resolve. We have often stated that the credibility of the witnesses is a matter that lies exclusively within the province of the trier of fact. *See, e.g., Walker* v. *State, supra; Misskelley* v. *State, supra.*

Carter argues that the conviction should be reversed because a reasonable hypothesis exists to rebut the circumstantial evidence of guilt presented by the State. He argues specifically that Shirley Carter committed suicide as a result of her manic-depression. There was testimony at trial that Shirley had suffered from and received medication for that mental condition for over seventeen years. Dr. Frank Bivens, a family practitioner, testified that suicide is a concern among individuals afflicted with that mental illness. The deceased had other health problems as well which included incontinency, Wolff-Parkinson-White syndrome, and a frozen shoulder, which had been non-surgically operated on just prior to her death. Carol Wilkinson, who saw the deceased three days before her death, stated that Shirley Carter told her that she had found a plot where she wanted to be buried and added that she was lonely, depressed, and bored. According to Wilkinson, there was no doubt in her mind that Shirley committed suicide. Carter further points to testimony to show that Ethridge Carter's fingerprints were not on the gun and that there was no sign that the gun had been wiped clean. Also, the gun powder residue tests failed to show that he had fired a weapon. Dr. Paretti testified that the wound was consistent with a suicide and that other than the bullet wound, there were no other signs of trauma. Furthermore, no motive for the killing was shown by the State. Finally, the EMT who took the pistol from the deceased's hand — Alan Hubbard — stated that the pistol was in her right hand.

■■ This court has observed:

Where it is shown by the evidence, on one side, that death may have been accidental, or it may have been the result of natural causes or due to suicide, and on the other side, that it

was through criminal agency, a conviction cannot be sustained. Proof of death cannot rest in the disjunctive. It must affirmatively appear that death resulted from criminal agency.

*Kagen* v. *State*, 232 Ark. 189, 194, 334 S.W.2d 865, 867 (1960) (quotation marks and citation omitted). We have further observed:

> This demands that in a case depending upon circumstantial evidence the circumstances relied upon must be so connected and cogent as to show guilt to a moral certainty, and must exclude every other reasonable hypothesis than that of the guilt of the accused. Circumstances, however strong they may be, ought never coerce the mind of the jury to a conclusion of guilt if they can be reconciled with the theory that one other than the defendant has committed the crime, or that no crime has been committed at all.

*Johnson* v. *State*, 210 Ark. 881, 882, 197 S.W.2d 936, 936 (1946), *quoting Bowie* v. *State*, 185 Ark. 834, 49 S.W.2d 1049 (1932).

■ We do not believe that suicide is a reasonable hypothesis for the death of Shirley Carter. In deciding as we do, we focus on the evidence produced by the State, which we deem to be substantial, and on the fact that the State's evidence disparages the reasonableness of the suicide theory. To reiterate in part, two witnesses at the scene testified that the gun was found in Shirley Carter's left hand, which would make a straight shot from right temple through to left temple virtually impossible, or at the very least, exceedingly difficult and unlikely. According to her daughter, Lori Brown, the deceased did not know how to use a gun. Shirley Carter's hands were found in an awkward position, and revealed no powder residue from a gun that was an emitter. Further, the pistol's safety was "on," and no one at the crime scene admitted activating it. And, lastly, Shirley Carter could not have engaged the safety after a shot to her head.

Carter makes two additional allegations of error: (1) attempts to influence the jurors in the courtroom prejudiced his case, and (2) jurors failed to report attempts to influence them by family and friends of the deceased which amounted to juror misconduct. The first issue relates to the conduct of another daughter of Shirley Carter's, Linda O'Donald, during closing arguments when she shook her head in disagreement with what defense counsel said. At a hearing on Carter's motion for a new trial, Sheriff Wayne Milligan

testified that he told her to stop doing that during a recess, but that none of the jurors saw O'Donald's displays. At the same hearing, no juror stated that he or she saw O'Donald's conduct. Carter also makes reference to the fact that Juror Gibson overheard others talk about the mysterious deaths of Carter's previous wives, but Gibson reported the incident to the court and was dismissed as a juror. None of the other jurors stated that this comment was overheard.

The rule is well settled that prejudice will not be presumed and that reversal will not be warranted absent a showing of prejudice. *Solomon* v. *State*, 323 Ark. 178, 913 S.W.2d 288 (1996); *see also Trimble* v. *State*, 316 Ark. 161, 871 S.W.2d 562 (1994); *Dillard* v. *State*, 313 Ark. 439, 855 S.W.2d 909 (1993). Here, the jurors did not see O'Donald's conduct or hear the reference to Carter's previous marriages as Juror Gibson did. No prejudice, as a result, has been shown.

Carter's next point is that juror Norma Hayes fell asleep during the trial. Because the juror missed an undetermined amount of evidence, argues Carter, the resulting verdict is tantamount to his being convicted by a jury of eleven. Carter adds that the sleeping juror was *prima facia* evidence of juror misconduct. Without adducing authority, Carter argues that no objection was necessary to preserve this point, and at trial, no objection was made. In Sheriff Milligan's affidavit, he states that he observed the sleeping juror and that he informed the court about the incident.

In the trial judge's letter order denying the motion for judgment of acquittal notwithstanding the verdict, the judge explained that the sleeping juror was brought to his attention and that he ordered the windows to be opened and called a recess. The court further stated:

> It is apparent to the court that this report of the sheriff as to a sleeping juror was known to the state and the defendant at the time it occurred.

This court has held that "a claim of jury misconduct raised for the first time in a motion for new trial be accompanied by an affirmative showing that the defense was unaware of the misconduct until after the trial." *Oliver* v. *State*, 322 Ark. 8, 20, 907 S.W.2d 706, 713 (1995); *Owens* v. *State*, 300 Ark. 73, 777 S.W.2d 205 (1989); *Hendrix* v. *State*, 298 Ark. 568, 768 S.W.2d 546 (1989). No such showing was made here. The defense was aware of the sleeping

juror and did nothing to correct the situation. Thus, the issue is not preserved for appeal.

■ Finally, Carter contends that it was error to give the jury the verdict forms with the guilty verdict form on top of the not-guilty verdict form. Carter contends that the not-guilty verdict form should be considered first. He cites no authority for his argument, however, and it should not be considered for that reason. *See Hillard* v. *State*, 321 Ark. 39, 900 S.W.2d 167 (1995); *Stevens* v. *State*, 319 Ark. 640, 893 S.W.2d 773 (1995).

The record in this case has been reviewed for other prejudicial error pursuant to Supreme Court Rule 4-3(h), and none has been found.

Affirmed.

DUDLEY, J., not participating.